**Opinion issued August 30, 2012**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00459-CV

———————————

**SONERRA RESOURCES CORPORATION, Appellant**

**V.**

**HELMERICH & PAYNE INTERNATIONAL DRILLING CO., Appellee**

———————————

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2007-75537-A**

———————————

**MEMORANDUM OPINION**

Appellant, Sonerra Resources Corporation ("Sonerra"), challenges the trial

court's rendition of summary judgment in favor of appellee, Helmerich & Payne

International Drilling Co. ("H&P), in Sonerra's suit against H&P for breach of contract. In two issues, Sonerra contends that the trial court erred in granting H&P's summary-judgment motion, denying its summary-judgment motion, and not awarding it attorney's fees.

We affirm.

## Background

Sonerra entered into an International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract (the "drilling contract") with H&P. Sonerra, an oil-well operator, retained H&P, a drilling contractor, to drill and work on an oil well in Nacogdoches County, Texas. During H&P's work at the well, H&P employee Billy Jack McDaniel was injured when hot gas was released from the well after a stripper rubber inside a rotating-control device ("RCD") failed. McDaniel sued Sonerra, who had furnished the RCD and the stripper rubber to H&P for use in drilling operations. Sonerra demanded that H&P, pursuant to an indemnity provision in article 14.8 of the drilling contract, defend and indemnify it from the claims made against it by McDaniel. H&P refused, contending that an indemnity provision in article 14.7 of the drilling contract required that Sonerra indemnify it and release it from any such liability.

The indemnity provisions relied upon by the parties are contained in Section 14 of the drilling contract, entitled "Responsibility for Loss or Damage, Indemnity,

2

Release of Liability and Allocation of Risk." Section 14 provides, in pertinent part,

14.7 Inspection of Materials Furnished by Operator: Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. *Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator, and Operator shall release Contractor from, and shall protect, defend and indemnify Contractor from and against, any such liability.*

14.8 Contractor's Indemnification of Operator: *Contractor shall release Operator of any liability for and shall protect, defend and indemnify Operator from and against all claims, demands, and causes of action of every kind and character, without limit* and without regard to the cause or causes thereof or the negligence of any party or parties, *arising in connection herewith in favor of Contractor's employees* or Contractor's subcontractors of any tier (inclusive of any agent or consultant engaged by Contractor) *or their employees, or Contractor's invitees, on account of bodily injury, death, or damage to property.* Contractor's indemnity under this Paragraph shall be without regard to and without any right to contribution from any insurance maintained by Operator pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.8 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

14.9 Operator's Indemnification of Contractor: Operator shall release contractor of any liability for, and shall protect, defend and indemnify Contractor from and against all claims,

3

demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors of any tier (inclusive of any agent, consultant or subcontractor engaged by Operator) or their employees, or Operator's invitees, other than those parties identified in Subparagraph 14.8 on account of bodily injury, death or damage to property. Operator's indemnity under this paragraph shall be without regard to and without any right to contribution from any insurance maintained by Contractor pursuant to Paragraph 13. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily assumed under Subparagraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnities, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnities shall automatically be amended to conform to the maximum monetary limits permitted under such law.

. . . .

14.13 Indemnity Obligation: Except as otherwise expressly limited in this Contract, it is the intent of parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under terms of this Contract, including, without limitation, Subparagraph 4.9 and 6.3(c), Paragraph 10 and 12, and Subparagraph 14.1 through 14.12 hereof, be without limit and without regard to the cause or causes thereof, including but not limited to, pre-existing conditions, defect or ruin of premises or equipment, strict liability, regulatory or statutory liability, products liability, breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise) any theory of tort, breach of contract, fault, negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties, including the party seeking the

4

benefit of the release, indemnity or assumption of liability, or any other theory of legal liability. The Indemnities, and releases and assumptions of liability extended by the parties hereto under the provisions of Subparagraphs 4.9 and 6.3 and Paragraphs 10, 12 and 14 shall inure to the benefit of such parties, their coventurers, co-lessees, joint owners, their parent, holding and affiliated companies and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Except as otherwise provided herein, such indemnification and assumptions of liability shall not be deemed to create any right to indemnification in any person or entity not a party to this Contract, either as a third beneficiary or by reason of any agreement of indemnity between one of the parties hereto and another person or entity not a party to this Contract.

Sonerra filed a third-party petition against H&P for breach of contract, alleging that H&P had breached the drilling contract by refusing to defend and indemnify it from the claims made against it by McDaniel. Sonerra sought to recover its defense costs as well as the amounts for which it was ultimately held liable.[1] Sonerra also sought its attorney's fees.[2] H&P generally denied Sonerra's claims, asserted various affirmative defenses, and filed a counterclaim for breach of the drilling contract. H&P also sought its attorney's fees.

---

[1] Sonerra's third-party suit against H&P was severed into a separate action. After the trial court granted summary judgment in favor of H&P and dismissed Sonerra's indemnity claims, Sonerra's insurer settled the claims made by McDaniel against Sonerra (the "McDaniel Settlement"). Sonerra, H&P, and their respective insurers then entered into a funding agreement whereby H&P agreed to pay one-half of the McDaniel Settlement. The parties also acknowledged that Sonerra intended to appeal the trial court's judgment, and the parties reserved their rights to pursue reimbursement from each other for the amounts they respectively paid in McDaniel Settlement.

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon Supp. 2011).

5

H&P then filed its summary-judgment motion, arguing that the drilling contract, and specifically article 14.7, unambiguously required that Sonerra defend and indemnify it for the claims made by McDaniel for his injuries that arose from the use of the defective RCD, which was provided by Sonerra. Sonerra filed its competing summary-judgment motion and response, arguing that the drilling contract, and specifically article 14.8, unambiguously required that H&P defend and indemnify it for the claims made by McDaniel for his injuries.

The trial court granted H&P's summary-judgment motion, denied Sonerra's summary-judgment motion, and ordered that Sonerra take nothing on its claims against H&P. The trial court subsequently entered final judgment in favor of H&P, and it awarded H&P its attorney's fees for its defense of the indemnity suit and for appeal.

### Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985).

6

Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in its favor. *Id*. at 549.

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the trial court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004).

**Indemnity**

In its first issue, Sonerra argues that the trial court erred in granting H&P's summary-judgment motion and denying its summary-judgment motion because the RCD and the component stripper rubbers are "clearly equipment" rather than "materials," as referred to in the indemnity provision in article 14.7. Sonerra asserts that article 14.7 "requires indemnity [only] for property damage and economic loss" rather than for claims for bodily injury like those brought against it by McDaniel. Sonerra further asserts that the "more specific" article 14.8, which requires H&P to indemnify it for McDaniel's bodily injury claims, "should control over general" article 14.7 and, when harmonized, articles 14.7 through 14.9 establish its entitlement to indemnity from H&P as a matter of law. In response, H&P asserts that the term "materials" as used in article 14.7 includes the defective stripper rubbers in the RCD, the phrase "any loss or damage" used in article 14.7

7

includes the damages that Sonerra sought to recover after being sued by McDaniel for bodily injury, and the "specific release" in article 14.7 "controls over the general indemnity provision" in article 14.8.

Indemnity agreements are construed under normal rules of contract construction. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). In construing a contract, a court must ascertain and give effect to the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333. We begin our analysis with the contract's express language. *See id*. And we analyze the provisions of a contract "with reference to the whole agreement." *Frost Nat'l Bank v. L & F Dists., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005); *see also Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) ("No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument."). Contract terms will be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex.

8

2005). If the contract can be given a certain or definite legal meaning or interpretation after applying the pertinent contract construction rules, then it is not ambiguous, and we will construe the contract as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312. "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

If a contract "is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *J.M. Davidson*, 128 S.W.3d at 229. However, a contract is not ambiguous merely because the parties disagree on its meaning. *Seagull Energy E & P, Inc.*, 207 S.W.3d at 345. Only where a contract is ambiguous may we consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the contract. *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333–34; *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006) (stating that court may not consider extrinsic evidence to create ambiguity).

We first address the parties' dispute over the term "materials," as used in article 14.7. Sonerra contends that the stripper rubber cannot qualify as a

9

"material" and that, for this reason, the indemnity provision in article 14.7 does not apply in favor of H&P to defeat Sonerra's breach-of-contract claim. We begin our analysis[3] by consulting the express language of the disputed provisions in the drilling contract and consider those in light of the entire contract. *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 333.

Article 14.7 expressly provides that H&P is not liable "for any loss or damage resulting from the use of materials furnished" by Sonerra. The article further provides that Sonerra releases and must indemnify H&P from and against "any such liability." Although the term "materials" is not expressly defined in the drilling contract, it is a term that is used throughout the contract in conjunction with other similar terms, including "equipment." For example, in article 4.9 of the contract, Sonerra agreed to reimburse H&P for certain costs of "material" and "equipment." In article 14.12, the parties set forth indemnity obligations for consequential damages related to "equipment" and "materials."

---

[3] In their briefing, the parties discuss case law from other jurisdictions that have construed the meaning of the word "materials" as used in unrelated contracts. The parties also ask us to consider provisions from the Texas Business and Commerce Code that discuss the terms "equipment," "materials," and "inventory." *See* TEX. BUS. & COM. CODE ANN. § 9.102 (Vernon Supp. 2011). However, we decline the parties' invitation to seek guidance from either case law addressing the meaning of words "material" or "materials" as used in distinguishable contracts or statutory provisions that have no direct application to the construction of the contract in the instant case.

Moreover, in section 4 of Exhibit A to the drilling contract, which is entitled "Equipment, Materials and Services to be Furnished by Contractor," the parties set forth the "machinery, equipment, tools, materials, supplies, instruments, services, and labor" to be provided by H&P at the well. The parties identified multiple items, including a drilling rig, rigging material, storage for mud and chemicals, and drill pipe. They also attached a document to Exhibit A that further described these items. The parties made no effort to indicate whether each of the items constituted "machinery," "equipment," "tools," "materials," or "supplies." Similarly, in section 5 of Exhibit A, which is entitled "Equipment, Materials and Services to be Furnished by Operator," the parties set forth the "machinery, equipment, tools, materials, supplies, instruments, services, and labor" to be provided by Sonerra at the well. Under this section, the parties identified multiple items, including mud storage tanks, drilling bits, special tools, and casing and tubing. As with section 4 of Exhibit A, the parties made no effort to identify whether each of the items constitutes "machinery," "equipment," "tools," "materials," or "supplies." Finally, in section 6 of Exhibit A, which is entitled "Equipment, Materials and Services to be Furnished by Designated Party," the parties set forth another extensive list of "machinery, equipment, tools, materials, supplies, instruments, services, and labor." The parties identified in a chart whether Sonerra or H&P was responsible for furnishing the listed items. Included among these items are the "Rotating

11

Head" and "Rotating Head Rubbers." In this section, like the others before it, the parties made no distinction between the items that were considered "materials," "equipment," "supplies," and the like. There is simply no indication in section 6 that any of the items listed, including the RCD and stripper rubbers, were only to be considered "materials," "equipment," or "tools" and that such items could only be considered as falling within the scope of one of these particular terms. Rather, the parties identified the RCD and stripper rubbers after generally referring to "machinery, equipment, tools, materials, supplies, [and] instruments." In sum, there is simply no indication in the written contract that these terms, as used throughout the contract, are mutually exclusive and refer to a distinct set of items.

Sonerra's efforts to restrict the construction of the term "materials" to exclude the stripper rubbers inside the RCD conflicts with the plain, ordinary, and generally accepted meanings of the words used in the drilling contract. *See Valence Operating Co.*, 164 S.W.3d at 662. The terms "material" or "materials" are defined as "the matter from which a thing is or can be made" or "things needed for an activity,"[4] "the substance or substances of which a thing is made or composed" or "any constituent element,"[5] "the equipment necessary for a

---

[4] THE NEW OXFORD AMERICAN DICTIONARY 1054 (2001).

[5] RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1185 (2d. ed. 2003).

12

particular activity,"[6] and "the elements, constituents,[7] or substances of which something is composed or can be made" or an "apparatus necessary for doing or making something."[8]

Sonerra admits in its briefing that it furnished the stripper rubber and the stripper rubber is a "component" of the RCD. The plain language of article 14.7, when considered in the context of the drilling contract, indicates that the parties used the term "materials" to generally refer to the physical items that were to be provided by Sonerra at the well. Sonerra's argument that article 14.7 is inapplicable because the defective stripper rubber and the RCD can only be considered a piece of "equipment" and not "materials" necessarily fails.[9]

---

[6]   COLLINS ENGLISH DICTIONARY - COMPLETE & UNABRIDGED (10th ed. 2009).

[7]   Sonerra even cites in its briefing the definition of "material" that refers to an "element" or "constituent." The term "element" is defined to be a "constituent part" and a "distinct part of a composite device." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 402 (11th ed. 2003). And constituent is defined to be "an essential part" and a "component element," WEBSTER'S DICTIONARY 248 (10th ed. 1999); "a constituent element, material, etc.; component," RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 436 (2d. ed. 2003); and a "component part of something." THE NEW OXFORD AMERICAN DICTIONARY 368 (2001).

[8]   MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 765 (11th ed. 2003).

[9]   Sonerra also argues that the parties' use of the term "equipment" in other indemnity provisions in the drilling contract reveals that the parties' used the terms "equipment" and "materials" to mean different things. For example, in article 14.1 H&P assumed liability for damage to its surface equipment, in article 14.2 Sonerra assumed liability for H&P's in-hole equipment, in article 14.3 Sonerra assumed liability for damage to H&P's equipment resulting from hydrogen sulfide

13

We next address the parties' dispute concerning the phrase "any loss or damage" as used in article 14.7. Sonerra asserts that, by the use of this phrase, the parties only required indemnity for property damage and economic loss, but not bodily injury claims. In support of its interpretation, Sonerra cites other provisions in the drilling contract where the terms "damage" or "loss" were used by the parties to refer to property damage and economic loss, rather than bodily injury. For example, in articles 14.1, 14.2, 14.3, and 14.4, all of which concern indemnity obligations for damage to "equipment," the terms "damage[s]" or "loss[es]" refer to property damage to the parties' equipment. However, the fact that the terms "damage[s]" or "loss[es]" were used in a more limited nature in these provisions is unremarkable given the subject matter of the provisions. The use of "damage" or "loss" to refer to property damage in these contractual provisions does not require that the terms be construed throughout the drilling contract to refer only to such losses. The terms "damage" and "loss" are not similarly limited by the subject matter of article 14.7. Rather, article 14.7 provides

or other corrosive elements, and in article 14.4 Sonerra assumed liability for its own equipment. We need not address whether the parties' use of the term equipment in these other indemnity provisions pertains to a subset of items described in the drilling contract, including items described in Exhibit A. Rather, we confine our analysis to determining the meaning of the term "materials" as that term was used by the parties in article 14.7 and in light of the entire drilling contract.

Sonerra also asserts that H&P waived certain arguments concerning the proper construction of the term "materials," but the parties squarely presented this definitional dispute to the trial court in their summary-judgment briefing.

14

indemnity for "*any loss or damage* resulting from the use of materials" furnished by Sonerra.[10]

Damage is generally defined as "[l]oss or injury to a person or property." BLACK'S LAW DICTIONARY 445 (9th ed. 2009). Damages include "physical harm caused to something in such a way as to impair its value, usefulness, or normal function" and "a sum of money claimed or awarded in compensation for a loss or an injury." THE NEW OXFORD AMERICAN DICTIONARY 429 (2001). Article 14.7, by its express terms, applies to *any* "loss" or "damage" resulting from materials furnished by Sonerra, and there is no indication that article 14.7 applies only to economic losses or property damage. In other places in the drilling contract, the parties necessarily used the terms "loss" or "damage" with specific reference to a type of loss or damage. But because the parties themselves failed to express in their written contract that the release and indemnity provided for in article 14.7 applied only to economic or property losses, we will not impose such a limitation. Thus, Sonerra's argument that article 14.7 is inapplicable because it applies only to economic losses and property damages necessarily fails.

---

[10] In its briefing, H&P argues that because Sonerra, in response to requests for admission, admitted that the "damages" it sought to recover incurred as the result of the use of the RCD. However, the responses to the requests for admission do not resolve the case. The requests themselves did not address or ask Sonerra to admit or deny a particular construction of the drilling contract.

We next consider whether, when construing the drilling contract as a whole and when seeking to harmonize all of the contractual provisions, Sonerra is entitled, pursuant to article 14.8, to be indemnified for the bodily injury claims brought against it by McDaniel, an employee of H&P, and the McDaniel Settlement. Article 14.8 provides that H&P shall release Sonerra from "*any liability*" for and shall indemnify Sonerra "from and against all claims . . . without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of [H&P's] employees" and other prescribed parties "on account of bodily injury, death or damage to property." Article 14.9 provides a reciprocal obligation by Sonerra to indemnify H&P "from and against all claims . . . without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of [Sonerra's] employees" and other prescribed parties "on account of bodily injury, death or damage to property." Under these indemnity provisions H&P and Sonerra agreed to indemnify the other for claims brought by their respective employees and other prescribed parties, including their respective contractor's and subcontractor's employees and invitees.

These reciprocal indemnity obligations must be considered with reference to the other provisions of the drilling contract, including article 14.7. As noted above, article 14.7 granted H&P indemnity for "any loss or damage" resulting from

16

Sonerra's materials, not simply economic or property damage. Also, as noted above, article 14.7 is not limited, in the manner suggested by Sonerra, by the use of the term "materials." Rather, by the express terms of article 14.7, Sonerra agreed to indemnify H&P for any loss or damage resulting from the use of the materials furnished by Sonerra. When all of the articles of the drilling contract are harmonized, it is evident that the indemnity obligation and release in article 14.7 carve out a set of claims that might otherwise be covered by the indemnity provision in article 14.8. *See Clark v. Cotten Schmidt, L.L.P.*, 327 S.W.3d 765, 773 (Tex. App.—Fort Worth 2010, no pet.); ("A specific contractual provision controls over a general provision"); *Ayres Welding Co., Inc. v. Conoco, Inc.*, 243 S.W.3d 177, 181 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (providing that more specific provisions of contract will control over general).

Sonerra's contention that article 14.8 is the more specific provision is premised upon its implied argument that article 14.8 is narrowly limited to employee bodily injury claims. But article 14.8, by its plain terms, is not so limited. Article 14.8 requires the contractor, H&P, to indemnify the operator, Sonerra, for all claims of every kind and character, without regard to cause, that are "in favor" of H&P's employees, subcontractors (of any tier), agents, consultants, their employees, and invitees for bodily injury, death, and property damage. Thus, article 14.8 applies to a broad class of persons and a broad class of losses and, as

such, is the more general indemnity obligation when compared to article 14.7. Article 14.9 provides a similar, general reciprocal indemnity obligation flowing from Sonerra to H&P. In contrast to article 14.8, article 14.7 addresses a particular kind of claim—loss or damage resulting from the use of Sonerra's materials. The only reasonable interpretation of the drilling contract is that article 14.7 grants a more specific indemnity that controls in the circumstances before us.

Moreover, that the indemnity and release provisions in article 14.7 apply in these circumstances in favor of H&P makes sense when we consider the specific purpose of article 14.7 and the general obligations in the entire drilling contract. In the first sentence of article 14.7, H&P agreed to both "visually inspect" the "materials" that Sonerra furnished and "notify" Sonerra of any "apparent defects." The plain purpose of this provision was to require H&P to alert Sonerra of any patent defects in the materials so that Sonerra could replace them or repair any defects discovered through the visual inspection. This provision afforded substantial protections to Sonerra in that, if complied with, it operated to prevent H&P's use of patently defective materials in drilling operations. Such protection was important to Sonerra since Sonerra bore significant indemnity obligations in the rest of the drilling contract, and H&P's use of patently defective materials could potentially give rise to significant liability for Sonerra. For example, Sonerra owed an indemnity obligation for H&P's in-hole equipment in article 14.2,

18

underground damage in article 14.6, and loss or damage to the hole. The second sentence of article 14.7, which released H&P from loss or damage resulting from the use of materials furnished by Sonerra and which required Sonerra to indemnify H&P for such loss or damage, immediately follows the language requiring H&P's inspection of materials and notification of defects. When read in its entirety, article 14.7 protects H&P from loss or damage caused by Sonerra's materials, but it also requires H&P to fulfill its inspection and notification duties with regard to apparent defects.[11]

If we were to interpret article 14.8 to grant Sonerra indemnity to apply to any claims brought by H&P employees, like McDaniel, or any other covered subcontractors, consultants, employees, or invitees, for bodily injury, death, or property damage resulting from the use of materials furnished by Sonerra, we would be defeating the obvious purpose of article 14.7. Sonerra's interpretation of the drilling contract would, in spite of the plain language of article 14.7, impose liability upon H&P for a broad class of losses, including bodily injury, death, or property damage, brought by a broad class of persons, including H&P's

---

[11] Sonerra also argues that article 14.13 supports its interpretation because it provides that all releases and indemnity obligations in the drilling contract are "without limit and without regard to the cause or causes thereof," including "defect or ruin of premises or equipment," "strict liability," "products liability," breach of warranty, breach of contract, and negligence of any degree. However, article 14.13 states that it applies "[e]xcept as otherwise expressly limited" in the drilling contract, and the language in this article does not modify the language in article 14.7.

employees, subcontractors (of any tier), agents, consultants, and invitees, even when such claims resulted from the use of materials furnished by Sonerra. Accepting Sonerra's arguments would remove at least some of the incentive for H&P to fulfill its inspection and notification duties because the scope of indemnity afforded to H&P under article 14.7 would be greatly diminished. Additionally, accepting Sonerra's interpretation would also remove at least some of the incentive for Sonerra, once notified of apparent defects, to repair or replace such defective materials because, despite the plain language of article 14.7, H&P would remain liable for a broad class of claims (bodily injury, death, property) brought by a broad class of parties, even when such losses result from the use of its materials.

In sum, to limit article 14.7 so as not to include within it an indemnity by Sonerra in favor of H&P for any claims brought by H&P employees for bodily injury caused by materials furnished by Sonerra, we would have to insert additional language into the drilling contract. Article 14.8 does not modify the indemnity and release language of article 14.7. If the parties had intended for the indemnity provision in article 14.7 to be so limited, the parties could have included language limiting the class of losses or damages to which it applied or excepting employee claims for losses or damages that would otherwise fall within article 14.8. When properly harmonized, and when considered in light of the entire agreement, article 14.7 of the drilling contract unambiguously precludes Sonerra's

20

indemnity claims against H&P.   Accordingly, we hold that the trial court did not err in granting H&P's summary-judgment motion and denying Sonerra's summary-judgment motion.

We overrule Sonerra's first issue.

## Conclusion

Having overruled Sonerra's first issue, we further hold that the trial court did not err in not awarding Sonerra its attorney's fees.  Thus, we overrule Sonerra's second issue.  We affirm the order of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.